IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER MBEWE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 2:16-cv-1074 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Patricia L. Dodge |
| THERESA A. DELBALSO, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM

Pending before the Court[1] is the Amended Petition for a Writ of Habeas Corpus filed by state prisoner Christopher Mbewe ("Petitioner") pursuant to 28 U.S.C. § 2254. ECF No. 32. For the reasons set forth below, the Court will deny the Amended Petition and deny a certificate of appealability.

## I.    Introduction

The victim in this case, Carol Tollan, was shot and killed on December 15, 2005 while she was sitting in her parked SUV on Girder Street, which is located near a wooded area in the New Homestead neighborhood of Allegheny County. Petitioner was married to Tollan's only daughter, Kimberly.[2] At the time of her death, Tollan (who was 61 years old), was residing with Petitioner, Kimberly, and their young daughter, Ciarra. Kimberly had recently informed Petitioner that she was leaving him. On the day Tollan was murdered she was scheduled to pick up the rental agreement for the new residence into which she was going to move with Kimberly and Ciarra.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to have a U.S. Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

[2] The Court shall refer to Petitioner's former wife, Kimberly Mbewe, his mother, Hilda Mbewe, and his daughter, Ciarra Mbewe, by their first names.

The police arrested Petitioner on January 3, 2006 and charged him with criminal homicide in Tollan's shooting death. His jury trial was held in the Court of Common Pleas of Allegheny County from July 8 through July 15, 2009. Attorneys Richard Narvin and Candace Ragin were his trial counsel. The jury convicted Petitioner of first-degree murder and the trial court sentenced him to the mandatory term of life imprisonment without the possibility of parole.

Petitioner commenced this federal habeas case in 2016. At his request, the Court stayed this case while he exhausted his state court remedies. In April 2019, Petitioner filed a motion to lift the stay. ECF No. 17. He subsequently filed the pending Amended Petition in which he raises the following grounds for relief:

Claim A  The Commonwealth introduced insufficient evidence to support his conviction because "it did not present any eyewitness testimony with respect to the shooting nor present any DNA or fingerprint evidence which would establish that [he] murdered" Tollan;

Claim B  The trial court erred in denying the defense's: (1) pre-trial motion to supress two of the statements Petitioner gave to detectives; and, (2) motion for mistrial;

Claim C  trial counsel was ineffective for failing to: (1) introduce at trial the preliminary hearing testimony of Petitioner's mother, Hilda; and, (2) introduce Petitioner's phone records at the suppression hearing.

ECF No. 32 at 4-5.

Additionally, in Claim D Petitioner contends that he has "new evidence" of his innocence, which was provided to him in 2016 and 2017 by fellow inmates at SCI Mahanoy. The alleged new evidence is the unsworn statement of Germaine Edge (*id.* at 7) ("the Edge Statement"), which Petitioner obtained around January 2016, and the declaration of Deaundra Williams (*id.* at 8) ("the Williams Declaration"), which is dated August 4, 2017. Petitioner claims that this alleged new evidence supports his contention that Kimberly and/or an individual named Brandon Alton are responsible for Tollan's murder. *Id.* at 5.

2

In their Answer, Respondents assert that the Court must deny the Amended Petition because Petitioner's claims either lack merit, are procedurally defaulted, or are non-cognizable.[3] ECF No. 34. Petitioner filed his Reply at ECF No. 43.

## II.    Relevant Background

### A.  The Suppression Hearing

Petitioner filed a pre-trial motion to supress the statements he gave to detectives on December 15, 2005 (during which he denied any involvement in Tollan's shooting), and on January 3, 2006 (during which he indicated that Ben Adams, a friend of his, shot Tollan). Resp's Ex. 3. He asserted that his statements were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) because the detectives disregarded his requests for an attorney and because he could not read or understand the English language.[4]

Petitioner testified at the suppression hearing. So did Detective James McGee, who was one of the detectives who interviewed Petitioner on December 15, 2005 and January 3, 2006. Detective McGee testified that during the December 15 interview Petitioner was not read his *Miranda* rights because he was not considered a suspect at that time. Suppression Hr'g Tr. at 10-11. He further testified that Petitioner was read his *Miranda* rights at the beginning of the January 3 interview. *Id.* at 10-15. Detective McGee stated that the detectives read Petitioner the rights form and wrote in the answers that Petitioner gave them. Although Petitioner declined to sign the form,

---

[3] Respondents have submitted a hard copy of the state court record, including the transcripts for Petitioner's trial and his preliminary, suppression, and sentencing hearings, as well as the hearing held on his first petition for collateral relief under Pennsylvania's Post Conviction Relief Act ("PCRA"). Respondents also electronically filed as exhibits to their Answer relevant parts of the state court record, including all state court opinions cited herein.

[4] Petitioner, who was 31 years old at the time of the suppression hearing, testified that he was born in Africa and had been living in the United States for approximately nine years. Suppression Hr'g Tr. at 37.

he agreed to speak with the detectives. *Id.* at 12, 18. Detective McGee testified that Petitioner did not request a lawyer at any point during either interview or indicate that he did not want to speak with the police. *Id.* at 12-13. In fact, between December 15 and January 3 Petitioner had initiated contact with the police on several occasions. *Id.* at 10.

Petitioner testified that during the December 15 interview he was handcuffed for about two hours and accused of murder. He said that he repeatedly requested to speak to an attorney during this interview. *Id.* at 9, 25-28. Petitioner also stated that he was not read his *Miranda* rights or shown the rights form during the January 3 interview, despite being handcuffed the entire interview and repeatedly requesting to speak to an attorney. *Id.* at 28.

The trial court denied Petitioner's motion at the conclusion of the suppression hearing. It determined that Detective McGee's testimony was more credible than Petitioner's testimony. *Id.* at 56.

### B. The Trial

Kimberly testified at the trial that she and Petitioner began dating in September 1999. They were married in 2002 and their daughter, Ciarra, was born that same year. They lived in a home on Provost Road and Tollan eventually moved in with them. Tollan did not always approve of the way Petitioner treated Kimberly and at times there was "tension" between Tollan and Petitioner. Trial Tr. at 140-42.

In November or early December of 2005 Kimberly informed Petitioner that she was ending their marriage and that she, Ciarra, and Tollan were moving out of their Provost Road home. *Id.* at 142-43, 172. They bought supplies, including paint rollers, so that they could do some home improvements prior to the move. *Id.* at 144, 157-58.

On December 15, 2005 Tollan was scheduled to meet with a rental agent to obtain the lease for the new residence. *Id.* at 145. Kimberly, who worked in Butler County, left the house around 9:30 a.m. *Id.* at 147-49. Ciarra attended St. Norbert's Head Start Program and Petitioner drove her there that morning. *Id.* at 250. He often wore a hooded camouflage jacket and was observed wearing that jacket when he took Ciarra to St. Norbert's and also when he picked her up there later that day. *Id.* at 146-47, 255-57, 263-64.

St. Norbert's Head Start Program was usually open until 2:00 p.m. However, it closed early on December 15, 2005 due to bad weather conditions. Beginning around 11:45 a.m. employees began calling individuals listed on their students' contact sheets to inform them of the early closure. An employee first called Petitioner on his cell phone and got a busy signal. She called him numerous other times but he never answered the calls. The employee also called the cell phones of Kimberly and Tollan and received no answer. She left voice messages for Petitioner, Kimberly, and Tollan. Petitioner picked up Ciarra around 1:15 p.m. He told the employees at St. Norbert's that he missed their calls because he was sleeping. *Id.* at 251-56.

When Kimberly eventually checked her cell phone, she heard the messages from the St. Norbert's employee and then called Petitioner. He did not answer her call so she called Tollan's cell phone. By this time, it was around 2:00 p.m. Detective McGee was at the scene of the crime and answered Kimberly's call to Tollan's cell phone. He informed her that her mother was found dead in her SUV, which was parked on Girder Street. *Id.* at 149-50, 212-13.

There are only a few houses on Girder Street, and at the time one of them was abandoned. Talisha Bose resided on that street, and when she left for work on December 15, 2005 she saw Tollan sitting in her SUV parked in front of the abandoned house. Bose testified that she pulled her car next to Tollan's and spoke with her briefly. Bose asked Tollan, who was sitting in the

driver's seat of her SUV, if she was okay. Tollan replied that she was and that she was waiting for her son-in-law. *Id.* at 88-92. Petitioner was Tollan's only son-in-law. *Id.* at 162.

Geraldine Collins also resided on Girder Street. She testified that she was driving home around 12:15 p.m. on December 15, 2005 when she observed Tollan's SUV parked outside the abandoned house. As Collins approached the vehicle, she noticed that Tollan was slumped over and blood was coming out of her mouth. *Id.* at 95-99. Tollan had been shot twice in the head at close range by someone in the passenger's seat or passenger's side of the vehicle. *Id.* at 116-18, 406-13. Collins' husband called 911 and the police arrived on the scene around 12:20 p.m. *Id.* at 111.

Tollan's cell phone rang several times while the officers were processing the scene. Detective McGee eventually answered the cell phone, and that is when he spoke with Kimberly and told her what had happened. He requested that she come to the police station for an interview. Kimberly asked Detective McGee about Petitioner and Ciarra, and she informed him that Petitioner might be at work. *Id.* at 212-14.

Petitioner worked at an assisted living center that was located approximately 1½ miles from the scene of the murder. *Id.* at 214, 230. Detective McGee went to his place of employment and Petitioner accompanied him to the police station. Officers interviewed both Petitioner and Kimberly there that evening. *Id.* at 214-15.

Petitioner told Detective McGee and Trosky during this December 15, 2005 interview that he loved Tollan, would not have hurt her, and that there had been no problems between them. According to the version of events Petitioner gave on this date, that morning he took Ciarra to St. Norbert's and then returned home. Kimberly left for work and Tollan told Petitioner that she was going to meet with the real estate agent and go to the bank. Petitioner told the detectives that

Tollan left the house in her SUV between 11:00 a.m. and 11:30 a.m. He left the house in his own car around 11:50 a.m. and went to the South Side Works to do some Christmas shopping. When he returned to his car, Petitioner said, it would not start and so he began walking to his mother's house, which was located approximately three miles away. *Id.* at 216-27.

Petitioner said that while he was walking near Beck's Run Road his mother, Hilda, called him and he asked her for a ride. She picked him up, and that is when he checked his cell phone messages and learned that St. Norbert's was closing early. Petitioner said he and Hilda went to St. Norbert's and retrieved Ciarra, and then they all went to Hilda's house. *Id.* at 216-27. Petitioner called a jitney to drive him to work, but it never arrived so he took a bus to the South Side Works to get his car. Petitioner told the detectives that he was able to get his car started and he drove it to work. *Id.*

Petitioner also told the detectives that he wore a black and yellow leather coat the entire day. By this point investigators had learned from the employees at St. Norbert's that earlier that day Petitioner was wearing a hooded camouflage jacket. When the detectives asked Petitioner about that jacket, he denied that he owned one like it. *Id.* at 220-25. Kimberly and Petitioner gave investigators permission to search their home the evening of the murder. No hooded camouflage jacket was found among Petitioner's belongings. *Id.* at 280-82. The jacket was never located.

Petitioner remained in contact with investigators in the days following Tollan's murder. Detective McGee testified that "[Petitioner] would call the office wanting to talk to us saying that he had stuff to get off his chest. We told him that we would meet with him and talk with him if he wanted to. He told us that he wanted to tell us something but he wasn't ready yet." *Id.* at 283.

Hilda called the police on December 20, 2005. As result of what she conveyed to them, Detectives McGee and Trosky went to Petitioner's Provost Road home. They found him lying on

the floor of his first floor bathroom. His arms were tied loosely behind his back and he had Children's Tylenol frothing from his mouth. Petitioner did not become responsive until after the paramedics arrived. He then stated that the previous evening police officers had forced their way into his house and made him drink the Children's Tylenol. *Id.* at 283-87.

Two days later, on December 22, 2005, Petitioner went to the police headquarters and handed Detectives Trosky and James Meyers a hooded camouflage jacket. He said that it was the one they were looking for. *Id.* at 290-91, 318-19. The jacket had the name "McConaghy" stitched on it. Since Petitioner had denied on numerous occasions that he owned such a jacket, investigators checked with second-hand stores in the area to see if it was recently purchased. They learned the jacket had been donated to a thrift store located with three miles of Petitioner's house. That store's manager testified at the trial that the jacket with the name "McConaghy" stitched on it was put out for purchase four days *after* the murder, on December 19, 2005. *Id.* at 315-17. The Commonwealth introduced images from the store's surveillance camera for December 22, 2005 to support its theory that Petitioner had purchased the jacket that day and attempted to pass it off as the one he was seen wearing on the day of the murder. *Id.* at 292-96.

On December 27, 2005, Thomas Howell was riding his ATV in the wooded area near Girder Street. He noticed a purse in a bush and stopped to retrieve it. It contained Tollan's wallet and identification. Howell drove further down the path and came upon an object that appeared to be a tube wrapped in cloth that was secured by duct tape. He called the police and reported what he found. *Id.* at 321-26. The Commonwealth established at Petitioner's trial that the tube found by Howell was a homemade gun silencer and it was made out of a paint roller similar to the type that Petitioner had at his home. *Id.* at 356-62. The police notified Kimberly that her mother's purse had

been found and they showed her the homemade silencer. She informed them that the cloth used to construct it was from a missing pair of her pajamas. *Id.* at 298.

The police arrested Petitioner on January 3, 2006. When Detectives McGee and Trosky interviewed him that day he told them that "he screwed up some peoples' lives and he wished he wouldn't have done that." *Id.* at 305. Petitioner claimed for the first time that he and Tollan had been having an affair. He said that not long before the murder he was at a bar on the South Side with a friend named Ben Adams with whom he had attended school in Africa. Petitioner said that he told Adams that he wished that Tollan "was gone." *Id.* at 306. According to Petitioner, Adams came to his Provost Road home on December 15, 2005 and Tollan agreed to give Adams a ride to another location even though she did not know him. Petitioner indicated that it was Adams that shot and killed Tollan because she was causing problems for Petitioner. *Id.* at 306-07.

Investigators checked numerous databases to try and locate Ben Adams but were unable to do so. There was no driver's license or record of him in either the City Police database or the State Police database. The Immigration and Naturalization Service ("INS") did not have a record of a Ben Adams either. *Id.* at 309.

At trial, Petitioner's former supervisor, Linda Miller, was one of the Commonwealth's witnesses. The prosecutor asked her a question about the police visit to Petitioner's worksite on December 15, 2005. Miller testified that another employee named Mike had informed her that day that there was a problem in Petitioner's personal life. *Id.* at 244. When the prosecutor asked Miller what Mike had said to her, Miller replied: "That there was a possibility that [Petitioner] had murdered his mother-in-law." *Id.*

A sidebar discussion was held and Attorney Narvin moved for a mistrial. *Id.* at 245. The prosecutor stated: "I spoke to [Miller] this morning, I interviewed her in the past, she never once

said that. I'm being honest with you. I was expecting what was written in here, that his mother-in-law was shot." *Id.* The trial court denied the motion for a mistrial. It informed the jurors that Miller's response was stricken and that they must disregard it. *Id.* at 246.

During Miller's cross-examination, Attorney Narvin ask her: "You made a remark in front of the jury earlier that the Judge ordered stricken from the record. Just to clarify that, you don't have any real evidence or any way of knowing that any of that is true, right?" *Id.* at 248-49. Miller confirmed that she did not and acknowledged that she was nervous. *Id.* at 248-49.

The trial court instructed the jury on first and third degree murder. Under Pennsylvania law, the elements of first-degree murder are: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and, (3) the defendant acted with malice and a specific intent to kill. *Id.* at 457-58. *see also* 18 PA. CONS. STAT. § 2502(a). The jury determined that the Commonwealth proved each of these elements beyond a reasonable doubt and convicted Petitioner of first-degree murder.

## C.  Direct Appeal

The trial court appointed Attorney Matthew Debbis to represent Petitioner in his direct appeal. In his concise statement of matters complained of on appeal Petitioner raised Claim A (insufficient evidence), Claim B(1) (trial court erred in denying the motion to suppress), and Claim B(2) (trial court erred in denying the motion for mistrial). The trial court addressed these claims in its Appellate Rule 1925(a) opinion ("Trial Ct. Op.") and determined that they had no merit. Resp's Ex. 9.

Thereafter, Petitioner filed his counseled brief to the Superior Court. Resp's Ex. 10. Importantly, Petitioner no longer challenged the trial court's decision to deny his suppression

motion (Claim B(1)). In his counseled appellate brief, he only raised Claim A (insufficient evidence) and Claim B(2) (trial court erred in denying the motion for mistrial). *Id.*

The Superior Court affirmed Petitioner's judgment of sentence in *Commonwealth v. Mbewe*, No. 646 WDA 2010, slip op. (Pa. Super. Ct. Oct. 26, 2011) ("*Mbewe I*"). Resp's Ex 12. It adopted in full the reasoning given by the trial court and denied Claim A and Claim B(2) on the merits.

The Supreme Court of Pennsylvania denied a petition for allowance of appeal on October 5, 2012. Resp's Ex. 16. Petitioner's judgment of sentence became final on or around January 3, 2013 at the expiration of the 90-day period for filing a petition for a writ of certiorari to the United States Supreme Court. 42 PA. CONS. STAT. § 9545(b)(3) (judgment of sentence becomes final at conclusion of direct review or expiration of period for seeking such review).

### D.  First PCRA Proceeding

The trial court, now the PCRA court, appointed Attorney Christina M. Stover to represent Petitioner in his first PCRA proceeding. In this proceeding, Petitioner raised the ineffective assistance of trial counsel claims that he now brings in this habeas case as Claim C(1) (failure to introduce at trial Hilda's preliminary hearing testimony) and Claim C(2) (failure to introduce at the suppression hearing Petitioner's phone records).[5] Resp's Exs. 18, 19.

The PCRA court held an evidentiary hearing on December 17, 2014 at which the following individuals testified: Petitioner; Margaret Kasuba (his sister); Attorney Debbis (direct appeal

---

[5] Petitioner also contended in his first PCRA proceeding that trial counsel was ineffective for failing to invoke his rights under the Vienna Convention because he allegedly had the right to have the Zambia Consulate notified that he had been arrested and charged with criminal homicide, and that he had newly discovered evidence to establish that his sister, Margaret Kasuba, could have provided him with an alibi. He does not raise those claims in this habeas case.

counsel); Attorney Narvin (trial counsel); Attorney Robert Foreman (the attorney who represented Petitioner for a period of time after the preliminary hearing); and Detective McGee.

After the hearing the PCRA court issued an order denying Petitioner's claims. Resp's Ex. 21. It issued an Appellate Rule 1925(a) opinion after Petitioner, through Attorney Stover, filed an appeal with the Superior Court. Resp's Ex. 23.

On December 16, 2015, the Superior Court affirmed the PCRA court's decision in *Commonwealth v. Mbewe*, No. 93 WDA 2015, slip op. (Pa. Super. Ct. Dec. 16, 2015) ("*Mbewe II*"). Resp's Ex. 26. The Supreme Court of Pennsylvania denied a petition for allowance of appeal on April 12, 2016. Resp's Ex. 30.

### E.  Second PCRA proceeding

The PCRA, at § 9543(a)(2), lists what types of substantive claims may be litigated in a post-conviction proceeding. In addition to the commonly-litigated claims such as ineffective assistance of trial counsel, a prisoner may bring in a PCRA proceeding claims alleging "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 PA. CONS. STAT. § 9543(a)(2)(vi). To be eligible for relief on such a claim, a prisoner must establish, among other things, that "the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence" and that the evidence "would likely compel a different verdict." *Commonwealth v. Cox*, 146 A.3d 221, 228 (Pa. 1996). Additionally, to fall within the PCRA's one-year statute of limitations, which is jurisdictional, the prisoner must file the claim within 60 days of the date it could have been presented. 42 PA. CONS. STAT. § 9545(b)(1)(ii), (2).[6]

---

[6] In an amendment effective December 24, 2018, § 9545(b)(2) now provides that a prisoner must file the newly discovered evidence claim within one year of the date it could have been presented.

In 2016, Petitioner, through Attorney Stover, filed a second PCRA petition. Resp's Ex. 31. Petitioner asserted, as he does in Claim D, that the Edge Statement is newly discovered evidence of his innocence. Edge asserted in his statement that about six months before Tollan's murder he witnessed Kimberly (who he knew as Dawn) buying a rifle from an individual named Brandon Alton.[7] Petitioner maintained that if he had been aware of this information at the time of his trial he could have presented evidence that Kimberly was a viable suspect in her mother's death.

The Commonwealth filed an answer in opposition to the second PCRA petition. Resp's Ex. 32. It pointed out, among other things, that Kimberly could not have committed the murder because she was at work in Butler County at the time of the shooting. *Id.* at 14; *see also* Trial Tr. at 147, 339-40, 347, 363-64.

The PCRA court denied Petitioner's second PCRA petition without a hearing. Resp's Ex. 37. Petitioner, through his new counsel, Attorney Diana Stavroulakis, filed an appeal with the Superior Court. It affirmed the PCRA court's decision in *Commonwealth v. Mbewe*, No. 751 WDA 2017, slip op. (Pa. Super. Ct. Mar. 13, 2018) ("*Mbewe III*"). Resp's Ex. 40.

The Superior Court held that although the second PCRA may have been timely filed under § 9545(b)(1)(ii), Petitioner's substantive claim under § 9543(a)(2)(vi) had no merit. *Mbewe III*, at 5-6. In so holding, it concluded that even if Edge's proposed "testimony was credited by a factfinder, it would not change the outcome of [the] trial." *Id.* at 7. In reaching this conclusion, the Superior Court summarized the "overwhelming evidence" the Commonwealth introduced at trial "that [Petitioner] was the individual that killed the victim." *Id.* It explained that Kimberly had an alibi because she was at work in Butler County at the time of the shooting. "This fact," the Superior

---

[7] According to Petitioner, Kimberly's middle name is Dawn and Brandon Alton is also known as "Batman."

Court noted, "was confirmed by cell phone records of calls placed by Kimberly from her boss' cell phone to both [Petitioner's] and the victim's phones near the time of the murder." *Id.* at 8. Accordingly, the Superior Court concluded, Edge's proposed testimony would not have changed the outcome of Petitioner's trial. *Id.*

The Supreme Court of Pennsylvania denied a petition for allowance of appeal on September 11, 2018. Resp's Ex. 44.

### F.  Third PCRA proceeding

Next, Petitioner filed a third PCRA petition that he litigated *pro se*. Resp's Ex. 45. In this proceeding, Petitioner claimed that Kimberly had offered Deaundra Williams $10,000 to murder Tollan, that Williams had declined her offer because he did not want to wait to collect the insurance money, and that Brandon Alton then carried out the crime because Williams refused to do so. In support of these new allegations, Petitioner presented the Williams Declaration, which is the second piece of alleged newly discovered evidence of innocence that Petitioner relies upon in Claim D. Williams averred that he called Alton the night of the murder and Alton indicated to him that he shot Tolland because Williams had refused Kimberly's request to kill her. Petitioner claimed that if Williams had testified at his trial the jury would have acquitted him.

The PCRA court determined that no hearing or response from the Commonwealth was required. It issued an order on October 23, 2018 in which it denied the third PCRA petition because Petitioner's alleged new evidence was not the type of after-discovered evidence of innocence required to overcome the PCRA's one-year statute of limitations. Resp's Exs. 46, 48. Petitioner did not appeal the PCRA court's decision to the Superior Court.

Thereafter, the stay in this case was lifted and Petitioner filed his Amended Petition with this Court. ECF No. 32.

14

### III.    Discussion

#### A.   Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. It permits a federal court to grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable. *Id.*; *see, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

It is Petitioner's burden to prove that he is entitled to the writ. *See, e.g., Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017). There are other prerequisites that he must satisfy before he can receive habeas relief (for example, he must overcome the burden imposed upon him by the standard of review set forth at 28 U.S.C. § 2254(d)), but, ultimately, Petitioner cannot receive federal habeas relief unless he demonstrates that he is in custody in violation of his federal constitutional rights. 28 U.S.C. § 2254(a); *see, e.g., Vickers*, 858 F.3d at 849.

#### B.   Exhaustion and Procedural Default

The "exhaustion doctrine" requires that a state prisoner raise his federal constitutional claims in state court through the proper procedures before he litigates them in a federal habeas petition. *See, e.g., Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). It is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). It "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The United States Court of Appeals for the Third Circuit has explained:

A claim is exhausted if it was "fairly presented" to the state courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. at 848; *Cristin v. Brennan*, 281 F.3d 404, 410 (3d Cir. 2002); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir. 1996). A petitioner has fairly presented his claim if he presented the same factual and legal basis for the claim to the state courts. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam). A petitioner can "fairly present" his claim through: (a) reliance on pertinent federal cases; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999).

*Nara v. Frank*, 488 F.3d 187, 197-98 (3d Cir. 2007). *See also Duncan*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.")

Additionally, and importantly, a petitioner must have "invoke[d] one complete round of the State's established appellate review process[,]" in order to satisfy the exhaustion requirement. *O'Sullivan*, 526 U.S. at 845. In Pennsylvania, this requirement means that a petitioner in a non-capital case such as this one must have first presented every federal constitutional claim raised in his federal habeas petition to *the Superior Court either on direct or PCRA appeal. See, e.g., Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

The doctrine of procedural default, like the doctrine of exhaustion, is "grounded in concerns of comity and federalism," *Coleman*, 501 U.S. at 730. To succinctly summarize it, it provides that a Pennsylvania state prisoner in a non-capital case defaults a federal habeas claim if he: (a) failed to present it to the Superior Court and he cannot do so now because the state courts would decline to address the claims on the merits because state procedural rules (such as, for example, the PCRA's one-year statute of limitations) bar such consideration; or (b) failed to

comply with a state procedural rule when he presented the claim to the state court, and for that reason the Superior Court declined to address the federal claim on the merits. *See, e.g., Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-56 (1999) (Stevens, J. dissenting) (describing the history of the procedural default doctrine); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Lines v. Larkins*, 208 F.3d 153, 162-69 (3d Cir. 2000).

If the Superior Court did not adjudicate a claim on the merits, this Court must determine whether that was because Petitioner procedurally defaulted it. If the claim is not defaulted, or if Petitioner has established grounds to excuse his default, the standard of review at 28 U.S.C. § 2254(d) (which is discussed below) does not apply and the Court reviews the claim *de novo*. *See, e.g., Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). However, in all cases and regardless of whether the standard of review at § 2254(d) applies, a state court's factual determinations are presumed to be correct under § 2254(e)(1) (also discussed below) unless Petitioner rebuts that presumption by clear and convincing evidence. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010); *Nara*, 488 F.3d at 201 ("the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d).") (citing *Appel*, 250 F.3d at 210).

## C. Standard of Review

In 1996, Congress made important amendments to the federal habeas statutes with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Among other things, AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). It reflects the view that habeas corpus is a "guard

against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted).

Deference to a State Court's Finding of Fact Under 28 U.S.C. § 2254(e)(1)

A finding of fact made by a state court always has been afforded considerable deference in a federal habeas proceeding. AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

Standard of Review When the Superior Court Adjudicated a Claim on the Merits

AEDPA also put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). It applies "to any claim that was adjudicated on the merits" by the Superior Court[8] and it prohibits a federal habeas court from granting relief unless the petitioner established that the Superior Court's "adjudication of the claim":

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court (here, the Superior Court) made a decision that

---

[8] When applying § 2254(d), the federal habeas court considers the "last reasoned decision" of the state courts. *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008)); *Brown v. Sup't Greene SCI*, 834 F.3d 506, 512 (3d Cir. 2016). When applying § 2254(d)'s standard of review to the claims adjudicated on the merits in Petitioner's direct appeal, this Court cites to the trial court's Appellate Rule 1925(a) opinion (Resp's Ex. 9) because the Superior Court in *Mbewe I* adopted the trial court's disposition of Petitioner's claims.

finally resolves the claim based on its substance, not on a procedural, or other, ground. *See, e.g.*, *Richter*, 562 U.S. at 98-100; *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).

If, when evaluating a claim, this Court determines that Petitioner has satisfied his burden under either provision of § 2254(d), this Court must then "proceed to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred." *Vickers*, 858 F.3d at 849 (citing *Lafler v. Cooper*, 566 U.S. 156, 174 (2012)).[9] That is because "a federal court can only grant the Great Writ if it is 'firmly convinced that a federal constitutional right has been violated[.]'" *Id.* (citing *Williams*, 529 U.S. at 389, and *Horn v. Banks*, 536 U.S. 266, 272 (2001) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review…none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]")).

Section 2254(d)(1) applies to questions of law and mixed questions of law and fact. In applying it, this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). It is "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 280 (2016) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)). It "includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *White v. Woodall*, 572 U.S. 415, 420 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012), which quoted *Williams*, 529 U.S. at 412).

---

[9] These steps "sometimes merge in cases in which the federal habeas court determines that the state court engaged in an 'unreasonable application' of clearly established Supreme Court precedent because it will be apparent from the explication of why the state court unreasonably applied that precedent that, under any reasonable application, a constitutional violation did occur." *Vickers*, 858 F.3d at 849 n.8.

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, this Court must determine whether the Superior Court's adjudication of the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *id.* at 406.

A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Williams*, 529 U.S. at 406. Therefore, the issue in most federal habeas cases is whether the adjudication by the state court survives review under § 2254(d)(1)'s "unreasonable application" clause.

"A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" *Dennis*, 834 F.3d at 281 (quoting *Williams*, 529 U.S. at 413). To satisfy his burden under this provision of AEDPA's standard of review, Petitioner must do more than convince this Court that the Superior Court's decision was incorrect. *Id.* He must show that it "'was *objectively* unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis added by Court of Appeals). This means that Petitioner must demonstrate that the Superior Court's decision "*was so lacking in justification that there was an error well understood and comprehended in*

*existing law beyond any possibility for fairminded disagreement*." *Richter*, 562 U.S. at 103 (emphasis added). As the Supreme Court noted:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer, supra*, at 75, 123 S. Ct. 1166. If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Id.* at 102.

The standard of review set forth at § 2254(d)(2) applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]"[10] *Burt v. Titlow*, 571 U.S. 12, 18 (2013). "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Dennis*, 834 F.3d at 281 (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice v. Collins*, 546 U.S. 333, 342 (2006) (reversing court of appeals's decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by

---

[10] Sections 2254(d)(2) and (e)(1) "express the same fundamental principle of deference to state court findings[,]" and federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." *Lambert*, 387 F.3d at 235. The Court of Appeals has instructed that § 2254(d)(2), when it applies, provides the "overarching standard" that a petitioner must overcome to receive habeas relief, while 2254(e)(1) applies to "specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision." *Id.*

the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. *Wood*, 558 U.S at 301 (quoting *Collins*, 546 U.S. at 341-42).

### D. Petitioner's Claims

Claim A:  Insufficiency of Evidence

In Claim A Petitioner contends that the Commonwealth introduced insufficient evidence to support the jury's verdict.[11] ECF No. 32 at 4; ECF No. 43 at 2-3. In denying this claim on the merits, the state court concluded that "it is clear that in looking at the facts in the light most favorable to the Commonwealth and all reasonable inferences drawn therefrom, that the Commonwealth met its burden of proving that [Petitioner] killed Tollan." Trial Ct. Op. at 14. It summarized the evidence the Commonwealth introduced to establish that Petitioner was the individual who shot Tollan, including that which demonstrated that, shortly before her murder, she was sitting in the driver's seat of her SUV; Tollan told Bose that she was waiting for her son-in-law; Petitioner was Tollan's only son-in-law; Tollan was shot at close range by someone in the passenger's seat or passenger's side of the vehicle; and the homemade silencer was made out of items missing from Petitioner's home. *Id.* at 15-16.  The state court also noted that the Commonwealth introduced evidence that:

> the two gunshot wounds to Tollan's head were fired from close range either from one or two feet away as evidence[d] from the dark smoke and stippling on Tollan's body. This evidence leads to the logical and reasonable conclusion that Tollan knew

---

[11] Respondents argue as an initial matter that Petitioner procedurally defaulted Claim A because he did not bring it as a federal constitutional claim when he raised it in state court. Their argument has no merit because in ruling upon such a claim Pennsylvania courts apply a standard that is consistent with the federal standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979).

who her killer was, thereby allowing that individual to get into the car and be close enough to her to have a contact wound killing.

*Id.* at 16.

Additionally, the state court set forth the evidence that demonstrated that Petitioner gave false or contradictory statements from which the jury could have inferred his guilt. *Id.* at 17 (citing *Commonwealth v. Carbone*, 574 A.2d 584, 589 (Pa. 1990) ("The fabrication of false and contradictory statements by an accused are evidence from which a jury may infer that they were made with 'an intent to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicative of guilt.")). It observed:

> [Petitioner's] explanations with respect to where he was and what he was doing on the day of the murder were incredible. When he went to pick up his daughter at St. Norbert's School at 1:30 p.m., he advised people at the Head Start Program that he had been asleep and did not hear their phone calls made between 11:45 a.m. and 12:00 p.m., yet the witnesses from the Head Start Program recalled getting a busy signal when they called [him]. What he told the police in their initial meeting was that at 11:50 a.m. he left his house to go to the South Side to do some Christmas shopping. He told the police that he never owned a camouflage, hooded jacket and repeated that denial on at least six different occasions and yet produced a camouflage, hooded jacket for the police which had the name McConagy [sic] on it. Kimberly Mbewe stated that the camouflage, hooded jacket that he owned did not have a name on it and that he wore that jacket often. He denied that he was wearing the jacket on the date of the murder and yet the people at the Head Start Program testified that he was wearing a camouflage, hooded jacket when he came to pick up his daughter. The jacket he produced for the police was not the one he was wearing on the day of the murder but, rather, one that he had purchased several days after the murder, which demonstrated a consciousness of guilt…
>                          - - -
> The denials made by [Petitioner] about his ownership of a camouflage jacket with a hood are not the only false statements that he made to the police. [He] stated that he had told a friend from Africa, Ben Adams, that things were not going well between he and his mother-in-law and his life would be much better off if she were not around. He also stated that he invited Ben Adams to his residence on the date of the shooting and asked Tollan to give Adams a ride to wherever he wanted to go to which she agreed and that is the last time that he saw [Tollan] and he never saw Adams again. [Petitioner] was unable to produce an address where Adams could be located or a phone number to contact Adams. A search of numerous police databases and the records a the [INS] could not locate a Ben Adams.

*Id.* at 16-17.

Because the Superior Court denied Claim A on the merits, AEDPA's standard of review applies to this Court's review of it. The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze it is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). In that decision, the Supreme Court explained that "[t]he Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt" of each element of the offense. *Jackson*, 443 U.S. at 309. Evidence is sufficient to support a conviction if, "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319).

When it denied Claim A the Superior Court applied the Pennsylvania equivalent of the *Jackson* standard. Trial Ct. Op., at 13; *Mbewe II*, at 2; *see also Evans v. Court of Common Pleas, Delaware Cnty.*, 959 F.2d 1227, 1233 (3d Cir. 1992) ("the test for insufficiency of the evidence is the same under both Pennsylvania and federal law"). Because it applied the correct legal standard, its adjudication satisfies review under the "contrary to" clause of § 2254(d)(1). *Williams*, 529 U.S. at 406; *Eley v. Erickson*, 712 F.3d 837, 848 (3d Cir. 2013) (Pennsylvania test for insufficient evidence is not "contrary to" *Jackson*).

The next inquiry for this Court, then, is whether the Superior Court's decision was an "unreasonable application of" *Jackson* under § 2254(d)(1) or based on an unreasonable determination of the facts under § 2254(d)(2). The Supreme Court has stressed to federal habeas courts conducting this analysis that:

> [w]e have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury…to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the…verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, __ (2011) (*per curiam*) (slip op., at 1). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. —, — (2010) (slip op., at 5)).

*Coleman*, 566 U.S. at 651.

Here, Petitioner's only argument in support of Claim A is that the Commonwealth "did not present any eyewitness testimony with respect to the shooting nor present any DNA or fingerprint evidence which would establish that [he] murdered" Tollan. ECF No. 32 at 4; ECF No. 43 at 2. This argument has no merit because the Commonwealth was not required to introduce eyewitness, DNA, or fingerprint evidence to satisfy its burden of proving Petitioner's guilt. Additionally, as the state court explained, the Commonwealth may rely upon circumstantial evidence "to sustain the conviction as long as it is not based upon mere speculation or conjecture." Trial Ct. Op., at 15 (quoting *Commonwealth v. Roscioli*, 309 A.2d 396 (Pa. 1973)).

Thus, Petitioner simply has not demonstrated that the Superior Court's adjudication of Claim A was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Therefore, it was not an "unreasonable application of" *Jackson* under § 2254(d)(1). Nor has he demonstrated that its decision was based on an unreasonable determination of the facts under § 2254(d)(2).

Based upon all of the foregoing, the Superior Court's decision to deny Claim A withstands review under § 2254(d) and it is denied for that reason.

Claim B(1):  Denial of the Motion to Suppress

In Claim B(1) Petitioner contends that the trial court erred in denying his motion to suppress "when he did not sign the *Miranda* form and could not read and understand the English language." ECF No. 32 at 4. Respondents contend that this claim is procedurally defaulted because Petitioner did not raise it to the Superior Court. *See* Resp's Ex. 10; *Mbewe I*, at 1. They are correct. As previously explained, in order to properly exhaust Claim B(1) Petitioner was required to raise it the Superior Court. *O'Sullivan*, 526 U.S. at 845. Because he did not do so, he procedurally defaulted Claim B(1).

A petitioner may avoid the default of a claim by demonstrating that the federal habeas court's failure to consider it will result in a fundamental miscarriage of justice." [12] *Coleman*, 501 U.S. at 750. This "gateway" actual innocence claim requires evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup v. Delo*, 513 U.S. 298, 316 (1995). "To qualify for this exception, the petitioner must present new, reliable evidence showing it is more likely than not that no reasonable juror would have voted to convict him." *Reeves v. Fayette, SCI*, 897 F.3d 154, 157 (3d Cir. 2018). The Supreme Court has cautioned "that tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting

---

[12] A petitioner may also avoid the default of a claim by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman*, 501 U.S. at 750. "'Cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[.]" *Id.* at 753 (emphasis in original). Petitioner does not invoke the "cause" and "actual prejudice" exception to the procedural default doctrine. For example, he does not contend in this case (and he did not assert in his first PCRA proceeding when he could have raised a claim that direct appeal counsel was ineffective), that Attorney Debbis "caused" his default of Claim B(1) by deciding not to raise it in Petitioner's appellate brief to the Superior Court.

reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting Schlup, 513 U.S. at 329); *House v. Bell*, 547 U.S. 518 (2006). The Court of Appeals has explained:

> "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual innocence] standard." *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007); *see also Munchinski*, 694 F.3d at 336-37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538, 126 S. Ct. 2064.
>
> The gateway actual innocence standard is "demanding" and satisfied only in the "rare" and "extraordinary" case where "a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 569 U.S. at 386, 392, 401, 133 S. Ct. 1924 (internal quotation marks and citations omitted).

*Id.* (altered text added by Court of Appeals).

To the extent that Petitioner maintains that he can overcome the default of Claim B(1) because the Edge Statement and Williams Declaration establish that he is innocent and that Kimberly or Brandon Alton killed Tollan, that argument is rejected. As the Superior Court explained in *Mbewe III*, Kimberly could not have shot Tollan because she was at work in Butler County when the crime was committed. Moreover, Petitioner has not directed this Court to any evidence that the police considered her a suspect in her mother's murder.

As for Brandon Alton, he is at least the third individual Petitioner has claimed murdered Tollan. On the day he was arrested, Petitioner told the detectives that his friend Ben Adams was the one responsible for the shooting. In the second PCRA proceeding he argued that Kimberly was

a viable suspect. When the state court rejected that argument, Petitioner contended in his third PCRA proceeding that Alton carried out the crime when Williams refused to do so. In light of the evidence of Petitioner's guilt and his earlier attempts to pass blame other individuals, the PCRA court rejected outright Petitioner's assertion of actual innocence in his third PCRA proceeding and Petitioner did not appeal that decision to the Superior Court

In sum, neither the Edge Statement nor the Williams Declaration is sufficient to demonstrate that this case is one of the rare ones in which a procedural default can be avoided under the actual innocence standard. At his trial, the Commonwealth introduced evidence to establish that shortly before she was shot Tollan was sitting in the driver's seat of her SUV waiting for Petitioner; she was shot at close range by someone in the passenger's seat or passenger's side of the vehicle; the homemade silencer was made out of materials obtained from Petitioner's home; Petitioner had a motive to kill Tollan; he lied about the jacket he was wearing on the day of the murder; he bought another jacket days after the murder and tried to pass it off as the one the police had asked him about; and he gave the police incredible and contradictory statements about his whereabouts and about the circumstances of the crime. Petitioner's alleged newly discovered evidence does not call into question any of that evidence, let alone persuade this Court "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329).

Finally, if Petitioner could overcome the default of Claim B(1) and this Court could review it on the merits, it would still be denied. That is because the trial court did not credit the testimony that Petitioner gave at the suppression hearing that he was in custody on December 15, 2005, or that the police did not adequately advise him of his *Miranda* rights on January 3, 2006, or that he requested counsel on either occasion. Suppression Hr'g Tr. at 56; *see also* Trial Ct. Op., at 18-19.

Under § 2254(e)(1), this Court is bound by the trial court's credibility determinations unless Petitioner identified "clear and convincing evidence" that the trial court was wrong. He has not met his burden.[13] *See also Vickers*, 858 F.3d at 850 (even in pre-AEDPA cases, "'federal habeas courts [had] no license to redetermine credibility of witnesses who demeanor ha[d] been observed by the state trial court, but not by them'") (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (bracketed text added by the Court of Appeals)).

Based upon all of the foregoing, Claim B(1) is denied because it is procedurally defaulted. However, Petitioner would not be entitled to relief on this claim even if he could avoid his default in light of the credibility determinations made by the trial court.

<u>Claim B(2):  Denial of the Motion for a Mistrial</u>

In Claim B(2) Petitioner contends that the trial court erred in denying his motion for a mistrial. Under Pennsylvania law, "[t]he trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial." *Mbewe I*, at 3 (quoting *Commonwealth v. Bozic*, 997 A.2d 1211, 1226-27 (Pa. Super. Ct. 2010)). The decision whether to grant a mistrial is a discretionary one. *Id.* A mistrial is "an extreme remedy required 'only when an incident is of such a nature that its unavoidable effect is to deprive the [defendant] of a fair and impartial tribunal.'" *Id.* (quoting *Commonwealth v. Johnson*, 719 A.2d 778, 787 (Pa. Super. Ct. 1998) (en banc) (additional citations omitted).

The Superior Court held that the trial court did not abuse its discretion in denying the defense's motion for a mistrial. *Mbewe I*, at 3-4. It agreed with the trial court that:

---

[13] The Court notes that in support of Claim C(2) Petitioner relies upon phone records that indicate he called his immigration lawyer and the Public Defender's Office the morning after the murder (on December 16, 2005). Those records, however, are not "clear and convincing evidence" that the trial court was wrong when it rejected his contention that he requested counsel on December 15, 2005 or on January 3, 2006.

it is clear that no error was committed in failing to grant [Petitioner] a mistrial. Miller's testimony was presented for a very limited purpose and that was to show [Petitioner's] work pattern. When [Miller] was asked a question as to whether or not [Petitioner] had any personal problems, the expected answer was his mother-in-law had been shot not that [Petitioner] was a suspect in that particular homicide. [Miller's] answer was stricken and Miller then testified that she was aware that his mother-in-law had been murdered and [Petitioner] did not leave work after finding out his mother-in-law had been killed. During her cross-examination she acknowledged that she had no first-hand knowledge of the homicide. Her statement did not rise to such level so as to prejudice [Petitioner] and deprive him of a fair trial.

Trial Ct. Op., at 21.

Respondents contend that this Court must deny Claim B(2) because it is a purely state-law claim and, therefore, is not cognizable in federal habeas corpus. They are correct. Although Petitioner asserts that the trial court's decision violated his due process rights, he cannot repackage a state law claim into a federal due process claim simply by stating that he was denied a fair trial based upon a ruling of state law. *See, e.g., Johnson v. Rosemeyer*, 117 F.3d 104, 109-10 (3d Cir. 1997).

In any event, when Petitioner raised Claim B(2) to the Superior Court he did not argue that the trial court's decision violated his right to due process. *See* Resp's Ex. 10 at 27-30. Therefore, any due process claim is procedurally defaulted (and there are no grounds that would permit him to avoid a default for the reasons already discussed).

Finally, there is no merit to any contention that the trial court's decision to deny a mistrial rendered Petitioner's trial fundamentally unfair and, therefore, violated his substantive due process rights. The prosecutor did not purposely elicit Miller's objectionable testimony, the trial court immediately instructed the jurors that it was stricken and they must disregard it, there was no insinuation that Miller had any special, firsthand knowledge of the murder, and during cross-examination Miller confirmed that she did not. Trial Tr. at 245-49. Therefore, even if Petitioner

30

had not procedurally defaulted a due process claim, or he could avoid the default, he still would not be entitled to relief on Claim B(2).

In conclusion, Claim B(2) is in actuality a claim of state law error and, as such, is not cognizable. To the extent that Petitioner's brings a due process claim, he procedurally defaulted it because he did not raise it to the Superior Court. It also has no merit because the trial court's decision to deny a mistrial did not render his trial fundamentally unfair. For each of these reasons, Claim B(2) is denied.

<u>Claim C:  Ineffective Assistance of Trial Counsel</u>

Claims of ineffective assistance are governed by the standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* recognized that a defendant's Sixth Amendment right to the assistance of counsel for his defense entails the right to be represented by an attorney who meets at least a minimal standard of competence. 466 U.S. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Titlow*, 571 U.S. at 24.

Under *Strickland*, it is Petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" *Titlow*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690); *Richter*, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting *Strickland*, 466 U.S. at 689). Counsel cannot be

deemed ineffective for failing to raise a meritless claim. *See, e.g., Preston v. Sup't Graterford SCI*, 902 F.3d 365, 379 (3d Cir. 2018).

*Strickland* also requires that Petitioner demonstrate that he was prejudiced by trial counsel's alleged deficient performance.[14] This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Counsel's errors must be so serious as to have "deprive[d] [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. Under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

In Claim C(1) Petitioner contends that his trial counsel was ineffective for failing to introduce the preliminary hearing testimony of his mother, Hilda, as an unavailable alibi witness.[15] She testified at the preliminary hearing that she called Petitioner around 12:40 p.m. on the day of the murder and that Petitioner said he was in the South Side. Preliminary Hr'g. Tr. at 38-43. Petitioner asserts that his trial counsel should have introduced Hilda's preliminary hearing testimony at the trial to establish that he had an alibi.

The Superior Court denied Claim C(1) on the merits because Hilda's preliminary hearing testimony, assuming it accurately described Petitioner's location, merely established that she spoke with him approximately 30 to 40 minutes after the murder. Therefore, the Superior Court determined, Hilda's preliminary testimony did not preclude Petitioner's presence at the scene of

---

[14] Because a petitioner cannot prevail on an ineffective assistance claim unless he establishes all prongs of the *Strickland* test, the Supreme Court permits courts to address only the prejudice prong if it is more efficient to proceed in that manner. 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

[15] Hilda was unavailable at trial because she had been deported upon the expiration of her visitor's visa. *Mbewe II*, at 2.

the crime and he was not prejudiced by trial counsel's failure to introduce it at trial. *Mbewe II*, at

10-11. The Superior Court held:

> [Petitioner] fails to establish that [Hilda's preliminary hearing] testimony would
> have provided an alibi for the time the murder was committed, a half hour earlier
> than the initial phone conversation with her. *See* [Appellant's Brief] at 18-22.
>
>  An alibi is "a defense that places the defendant at the relevant time in *a*
> *different place than the scene involved* and so *removed* therefrom as to render it
> impossible for him to be the guilty party." [*Commonwealth v. Kolenda*, 676 A.2d
> 1187, 1190 (Pa. 1996)] (citations omitted) (emphases added). Here, Hilda Mbewe's
> testimony about a telephone conversation over a cellphone at 12:40 p.m. would not
> have precluded [Petitioner's] commission of the murder a half hour or more earlier
> (between noon and 12:15). Moreover, her testimony about [Petitioner] wearing a
> camouflage jacket on the day of the murder (which he repeatedly denied), would
> not have been helpful to him.

*Mbewe II*, at 10-11 (emphasis added by Superior Court).

 In Claim C(2), Petitioner contends that his trial counsel was ineffective for failing to

introduce his phone records during the suppression hearing. Those phone records indicated that on

December 16, 2005—the day after his initial interview with the police—Petitioner called his

immigration lawyer at 9:28 a.m. and then called the Public Defender's Office approximately 20

minutes later. PCRA Hr'g Tr. at 36-38. Petitioner argued that if trial counsel had introduced his

phone records at the suppression hearing, the trial court would have credited his testimony that he

had asked for an attorney during his interviews on December 15 and January 3 and granted the

suppression motion. *Id.* at 67-68.

 The Superior Court held that Claim C(2) had no merit, holding:

> [T]he mere existence of a record of a telephone call to the Public Defender's Office,
> without more, does not show an attorney-client relationship, or the attempt to obtain
> one. Much less does it show that [Petitioner] attempted to invoke *Miranda* rights
> with the police. Quite simply, it proves nothing other than a phone call.
>      - - -
> [Petitioner] has failed to prove that he was deprived of his *Miranda* rights. Records
> of a telephone call to the Public Defender's Office, without more, would fail to
> support his claim that the police did not advise him of his *Miranda* rights. Counsel
> cannot be ineffective for failure to raise a meritless claim. [He] was not prejudiced.

*Mbewe II*, at 16-17.

The Superior Court's adjudication of Claim C(1) and Claim C(2) withstands AEDPA's deferential standard of review. It applied the *Strickland* standard when it evaluated them.[16] Therefore, its adjudication was not "contrary to" *Strickland* under § 2254(d)(1), *see, e.g., Williams*, 529 U.S. at 406, a point that Petitioner does not dispute. He only argues that the Superior Court's adjudication was an "unreasonable application of" *Strickland*.[17] ECF No 43 at 5-6.

In order to show that the Superior Court's adjudication was an "unreasonable applicable of" *Strickland* under § 2254(d)(1), Petitioner must do more than convince this Court that the Superior Court's decision was incorrect. *See, e.g., Dennis*, 834 F.3d at 281. As set forth above, he must demonstrate that the Superior Court's decision was objectively unreasonable, which means that it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Although Petitioner argues that the Superior Court's decision was an "unreasonable application of" *Strickland*, he does not provide this Court with any basis to conclude that he has met the difficult burden imposed upon him under § 2254(d)(1).

---

[16] Pennsylvania courts typically articulate *Strickland's* standard in three parts, while federal courts set it out in two. The legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. *See, e.g. Commonwealth. v. Mitchell*, 105 A.3d 1257, 1266 (Pa. 2014) ("this Court has divided [*Strickland's*] performance component into sub-parts dealing with arguable merit and reasonable strategy. Appellant must, therefore, show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and Appellant suffered prejudice as a result."); *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland*[.]").

[17] The Court further notes that Petitioner does not argue or establish that the Superior Court's adjudication of Claim C(2) was "contrary to" or an "unreasonable application of" *Miranda*. *See* ECF No. 32 at 5; ECF No. 43 at 5-6; *see, e.g., Mathias v. Superintendent Frackville*, 876 F.3d 462, 479-80 (3d Cir. 2017) (when the state court, in adjudicating an ineffective assistance claim, ruled on the merits of the underlying constitutional claim of error, § 2254(d)'s standard of review applies to the state court's adjudication of that underlying constitutional claim).

The Court further notes that Petitioner does not contend or establish that the Superior Court's adjudication of Claim C(1) or Claim C(2) was an unreasonable determination of the facts in light of the evidence presented at the preliminary, suppression, or PCRA hearing or at the trial. *See* ECF No. 43 at 5-6. Accordingly, its adjudication withstands review under § 2254(d)(2) as well.

In conclusion, Petitioner has not overcome the burden imposed upon him by either § 2254(d)(1) or (d)(2), under which this Court must evaluate the Super Court's adjudication of Claim C(1) and C(2). Accordingly, those claims are denied.

Claim D

In Claim D Petitioner contends that he is entitled to habeas relief because the Edge Statement and Williams Declaration demonstrate that he is actually innocent. ECF No. 32 at 5; ECF No. 43 at 6-7. However, "[i]t has long been recognized[,]" at least in a non-capital case such as this one, "that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'"[18] *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)). Thus, while a showing of "actual innocence" can be used to avoid the procedural default of a another cognizable habeas claim, "[i]t does not constitute an independent substantive claim." Brian R. Means, FEDERAL HABEAS MANUAL § 9B:84, Westlaw (database updated May 2020)

In *Herrera*, the possibility was left open that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant

---

[18] In contrast to "gateway" actual innocence claim offered to avoid a procedural default, "freestanding (or substantive) claims of actual innocence assert innocence without any accompanying constitutional defect in the trial resulting in the conviction." *Reeves*, 897 F.3d at 160 n.4 (citing *Schlup*, 513 U.S. at 313-16).

unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim." 506 U.S. at 417; *see also House*, 547 U.S. at 554-55; *McQuiggin*, 569 U.S. at 392. In *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009), which was a non-capital case in which a state inmate brought an action under 42 U.S.C. § 1983 to compel the State of Alaska to release biological evidence so that it could be subject to DNA testing, the Supreme Court *in dicta* assumed without deciding that an actual innocence claim could be brought in habeas, but noted "the high standard any claimant would have to meet" to succeed with such a claim. 557 U.S. at 71 (citing *House* and *Herrera*).

If indeed a freestanding actual innocence claim could be brought in a non-capital federal habeas case, the Edge Statement and Williams Declaration fall far short of offering the type of new evidence of innocence that would entitle Petitioner to habeas relief. The Court has already explained that that evidence does not satisfy *Schlup's* gateway standard for obtaining federal review despite a state procedural default. Thus, that evidence cannot satisfy the even more demanding standard required to demonstrate a stand-alone claim of actual innocence. *See, e.g., Reeves*, 897 F.3d at 160 n.4 (if a freestanding claim of actual innocence is cognizable in a non-capital habeas case, it would be assessed under an even more demanding standard than that which is required to avoid a procedural default since the freestanding claim is one that the petitioner's "conviction is constitutionally impermissible 'even if his conviction was the product of a fair trial[.]'") (quoting *Schlup*, 513 U.S. at 316 and citing *House*, 547 U.S. at 555 (concluding that the petitioner satisfied the gateway innocence standard announced in *Schlup* but not the higher standard for freestanding innocence discussed in *Herrera*)); see also FEDERAL HABEAS MANUAL § 9B:84 ("While the Supreme Court has not specified what showing would be required

for a habeas petitioner to make out a successful freestanding claim of actual innocence, the threshold would be "extraordinarily high," and the showing would have to be "truly persuasive.").

Based upon the foregoing, Claim D is denied. It is not cognizable. Even if it were, the evidence Petitioner offers in support of it does not satisfy the demanding standard that would be required to prevail on a freestanding claim of actual innocence.

### D.  Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from…the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*

Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be denied for the reasons given herein. Accordingly, the Court will not issue a certificate of appealability on any of Petitioner's grounds for relief.

## IV.     Conclusion

Based upon the foregoing, the Court concludes that Petitioner has not satisfied his burden of demonstrating that he entitled to the writ of habeas corpus. The Court will deny his Petition and will deny a certificate of appealability.

An appropriate Order follows.


Date:  January 4, 2021

/s/ Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge